UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

   - against -

STEPHEN COLANGELO, JR.,

               Defendant.

------------------------------------X



12Cr.838

~~13 Cr. 154~~ (RWS)

SENTENCING OPINION

**Sweet, D.J.**

On December 19, 2012, Stephen Colangelo, Jr.,
("Colangelo" or "Defendant") allocated to his criminal conduct
of securities fraud, pursuant to 15 USC 78j(b) and 78ff, and 17
CFR 240.10b-5, and wire fraud, pursuant to 18 U.S.C. § 1343.

For the reasons set forth below, Colangelo will be
sentenced to 78 months imprisonment followed by three years
supervised release.  A special assessment of $400, and
restitution to be provided by the government, is imposed.

Prior Proceedings

Defendant was named in a Four-Count Indictment filed

1

in the Southern District of New York on November 15, 2012. Count
One  charges that from March 2009 through February 2011, in the
Southern District of New York and elsewhere, Colangelo by use of
the means and instrumentalities of interstate commerce, and of
the mails, and of the facilities of national securities
exchanges, in connection with the purchase and sale of
securities, used and employed manipulative and deceptive devices
and contrivances, in violation 17 CFR 240.10b-5, by employing
devices, schemes and artifices to defraud; making untrue
statements of material facts and omitting to state material
facts necessary in order to make the statements made, in the
light of the circumstances under which they were made, not
misleading; and engaging in acts, practices and courses of
business which operated and would operate as a fraud and deceit
upon other persons and entities in connection with a scheme to
solicit and misappropriate investments in his Investment
Management Service. Count Two  charges that from March 2009
through February 2011, in the Southern District of New York and
elsewhere, Colangelo transmitted and caused to be transmitted by
means of wire communication in interstate and foreign commerce,
electronic mail messages between Colangelo and the Investment
Management Service Victims during the course of the securities
fraud scheme. Count Three  charges that from August 2009

2

through October 2011, in the Southern District of New York and elsewhere, Colangelo committed fraud in connection with a scheme to solicit and misappropriate investments in the Business Ventures. Count Four charges that from August 2009 through October 2011, in the Southern District of New York and elsewhere, Colangelo transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, electronic mail messages between Colangelo and investors in the Business Ventures.

The Sentencing Framework

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

    (C)   to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range established for —

    (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.  See Crosby, 397 F.3d at 114-15.

The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Defendant's personal and family history.

The Offense Conduct

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document.

At all times relevant, Colangelo was a resident of Rockland County, NY.

At various points, Colangelo operated Brickell Fund, LLC, a purported hedge fund, from an office in Rockland County, New York. Colangelo held himself out to be the "managing member" of the Brickell Fund. Between March 2009 and February 2011, Colangelo, held himself out as an investment manager and solicited funds from private investors by promising to use the investors' funds to trade securities for profit (hereinafter,

5

"Investment Management Service"). Between at least August 2009 and October 2011, Colangelo also solicited investments in at least the following three companies (the Business Ventures), which he had founded: Hedge Community, which COLANGELO told investors would operate a web-based social networking platform for hedge fund managers and investors; Start A Hedge Fund, which Colangelo told investors would provide an assortment of services to individuals and entities interested in starting hedge funds; and Under The Radar SEO, which Colangelo told investors would provide services related to online marketing.

Between March 2009 and June 2009, Colangelo offered his Investment Management Service to potential investors through the vehicle of the Brickell Fund. Colangelo represented to potential investors that he would manage the Brickell Fund and that the Brickell Fund would, at his direction, use investor funds to trade in securities for profit. At various other times, both before and after the existence of the Brickell Fund, Colangelo also offered his Investment Management Service to potential investors either through the vehicles of other funds and corporations that Colangelo established similar to the Brickell Fund, or as a personal service to be performed by him and operated from his personal brokerage account.

6

In the course of soliciting investments in his Investment Management Service, Colangelo made numerous false and fraudulent statements and representations.

For instance, Colangelo told potential investors that his compensation for performing the Investment Management Service would consist of a nominal management fee, if any, plus a percentage, typically between 30 percent and 50 percent of any trading profits. Colangelo represented to potential investors that the purpose of this structure was to ensure that his compensation would be almost entirely dependent on his trading success. On March 16, 2009, Colangelo sent an email to this effect to a potential investor in which he said that he would earn his "living ONLY when you make money with the firm." Likewise, on April 22, 2009, Colangelo sent an email to a group of investors stating, "[M]y clients and their famil[ies] come first. If I cannot earn them money why should I."

These representations were false. Despite suffering overwhelming losses as a result of his operation of his Investment Management Service, Colangelo consistently transferred to himself an enormous percentage of the investor

money under his control in order to support his personal expenses and unrelated business ventures.

Similarly, in order to encourage potential investors to invest in his Investment Management Service, Colangelo provided potential investors with supposed updates on his current trading activity, falsely claiming to have made profitable trades. For example, on March 30, 2009, Colangelo sent an email to potential investors stating: "With the market being DOWN over 250 points today CTIC [Cell Therapeutics, Inc.] was some pick.  We purchased 300,000 shares at 30 cents (90,000 dollars) and sold 300,000 shares at 45 cents (135,000 dollars) Up 50 percent ..... !"  On March 31, 2009, Colangelo also sent an email to potential investors reporting on "Today[']s Trades/Brickell Fund LLC" and stating: "[S]old 50,000 shares of YGE [Yingli Green Energy] at 6.40. We purchased 50,000 shares at 5.75 so we made a 65 point move .... Another Great Day! ! ! ! !"

These transactions were entirely fabricated by Colangelo. In fact, Colangelo had not engaged in any trading during the period of time when he made these representations, much less the specific trading that he reported to potential investors.

Further, Colangelo provided offering documents and emails to potential investors that described his investment strategy as involving "long-term, value investing," executed by a "team of investment professionals," using "multi-factor quantitative models to rank more than 3,000 stocks on a daily basis" with the goal of "maintain[ing] a broadly diversified portfolio that limits idiosyncratic company-specific risks[.]" In furtherance of this purported strategy, Colangelo claimed that he employed "a number of investment restrictions and risk control parameters, including concentration limits for individual stock and sector exposures."

Again, these representations were false. Colangelo had no such investment professionals, models, or restrictions. Contrary to his representations to potential investors about long-term investing and risk-management through diversification and concentration limits, Colangelo knew that his trading strategy was to engage in frenetic day-trading in a very small number of stocks, typically starting a day with no securities holdings, executing dozens of transactions in the chosen stocks throughout the day, and then liquidating all holdings by the end of the trading day.

Based on the foregoing fraudulent representations and promises, Colangelo succeeded in obtaining more than $1.6 million from investors for investment in his Investment Management Service between March 2009 and February 2011. Moreover, also based on the foregoing fraudulent representations and promises, Colangelo persuaded one of these same victims to make him a loan of approximately $250,000, at least $150,000 of which was to be used for the Brickell Fund's operations.

Almost immediately upon his first receipt of money from the Investment Management Service victims, and consistently thereafter, Colangelo misappropriated large amounts of investor money for his own personal benefit and to support his unrelated business ventures. There are numerous examples of Colangelo committing such fraud and misappropriation.

On April 3, 2009, one of the first Investment Management Service victims (Victim-1) sent Colangelo an investment of approximately $23,900. Thereafter, between April 3, 2009, and April 13, 2009, Colangelo spent all or nearly all of the investment on personal expenses, including restaurant expenses and personal retail expenses, while engaging in no

securities trading whatsoever. Similarly, on May 5, 2009, another Investment Management Service victim (Victim-2) sent an investment of approximately $350,000 to a bank account owned by the Brickell Fund and controlled by Colangelo. On May 6, 2009, Colangelo transferred approximately $100,000 of this $350,000 investment into his personal bank account. On May 11, 2009, Colangelo transferred approximately $49,000 more of this $350,000 investment into his personal bank account. In total, only approximately $200,000 of Victim-2's $350,000 investment was ever transferred into the Brickell Fund's brokerage account for trading purposes. Likewise, on May 21, 2009, a third Investment Management Service victim (Victim-3) sent an investment of approximately $100,000 to a bank account owned by the Brickell Fund and controlled by Colangelo. That same day, Colangelo transferred approximately $25,000 of Victim-3's investment into his personal bank account and the remaining $75,000 into the Brickell Fund's brokerage account. On May 26, 2009, Colangelo transferred $26,000 back from the Brickell Fund's brokerage account and, thereafter, transferred it to his personal account. On May 27, 2010, a fourth Investment Management Service victim (Victim-4) sent an investment of approximately $100,000 to a bank account controlled by Colangelo. Thereafter, between approximately June 4, 2010, and

11

June 30, 2010, Colangelo transferred approximately $55,000 of Victim-4's investment into his personal bank account and into the bank accounts of unrelated business ventures that Colangelo controlled.  Finally, between November 2010 and February 2011, a fifth Investment Management Service victim (Victim-5) sent a total investment of more than approximately $1 million to a bank account controlled by Colangelo.  Colangelo subsequently transferred approximately $500,000 of Victim-5's investment into his personal bank account and into the bank accounts of unrelated business ventures that Colangelo controlled.

Of the approximately $1.85 million that Colangelo fraudulently procured from the Investment Management Service victims in investments and loans, Colangelo misappropriated hundreds of thousands of dollars by transferring the money either to himself or to other unrelated business ventures that he controlled. Colangelo also lost approximately $900,000 by engaging in the Colangelo Day-Trading Strategy.

Instead of accounting for such failures at any point, Colangelo repeatedly lied to and misled the Investment Management Service victims in order to cover up the consistent and overwhelming losses that their investments suffered through

12

his operation of his Investment Management Service. For example, on June 1, 2009, Colangelo sent an email to several Investment Management Service victims that described the supposed trading activities of the Brickell Fund by saying, "CTIC popped today. We [w]ere buying CTIC at 40 cents. Up 46 percent today at 2.10 a share." This representation was false. The Brickell Fund did not have a position in CTIC and had not engaged in the trades that Colangelo reported. On June 2, 2009, Colangelo sent an email to Victim-2 that described the supposed trading activities of the Brickell Fund by saying, "[W]e also had a great day in the markets. CTIC was up six percent[.]" When Victim-2 responded that he "[h]ope[d] [he] made some money today," Colangelo responded, "You did [.] [E]very one in the brickell fund did[.]" Again, these representations were false. The Brickell Fund did not have a position in CTIC at the time. Moreover, although the Brickell Fund had, in fact, earned profits of approximately 12 percent trading several other stocks during the most recent trading day, Colangelo omitted the material fact that the Brickell Fund's total profit amounted to only approximately $860 because Colangelo had already by then lost or misappropriated several hundred thousand dollars of the Brickell Fund's trading capital and all that remained for trading purposes was $6,700. In May 2010, Colangelo falsely

reported to Victim-4 that his trading activity had earned
Victim-4 a 50 percent return on his initial investment of
$20,000 within two weeks of the investment. In fact, Colangelo
had never transferred Victim-4's investment into any brokerage
account Colangelo much less used it for trading. Moreover, the
trading that Colangelo engaged in during that period, with funds
other than those from Victim-4, produced negative results. As a
result of Colangelo false and fraudulent representations of
successful trading with Victim-4's money, Victim-4 invested
another $100,000 in Colangelo Investment Management Service.

Separately, in private placement memoranda that
Colangelo caused to be prepared and circulated for the purpose
of soliciting equity investments in the Business Ventures,
Colangelo also made misrepresentations about how much of the
investment money would be used for employee compensation,
professional fees, and finders' fees, including those for
himself. For example, in the private placement memorandum for
Hedge Community, Colangelo represented that salaries paid to
himself and others would amount to approximately $8,750 per
week. This representation was false. Between August 2009 and May
2010, Colangelo solicited and obtained approximately $700,000
from investors in Hedge Community, and transferred approximately

14

$133,000 from the Brickell Fund to Hedge Community (without the knowledge of investors in the Brickell Fund). Colangelo took more than approximately $320,000 of that money for his own personal benefit. In the private placement memorandum for Start A Hedge Fund, Colangelo also represented that of the approximately $3 million that he sought to raise, salaries and professional fees would account for approximately $400,000; in other words, approximately 13 percent. This representation was again false. Between April 2010 and September 2010, Colangelo solicited and obtained approximately $350,000 from investors in Start A Hedge Fund. Colangelo took more than approximately $200,000 of that money for his own personal benefit. Lastly, in the private placement memorandum for Under The Radar, Colangelo represented that of the approximately $1 million that he sought to raise, professional fees would account for approximately $100,000, and offering expenses and finders' fees would account for approximately $100,000; in other words, approximately 20 percent in total. This representation was false. Between June 2010 and October 2011, Colangelo solicited and obtained approximately $1.18 million from investors in Under The Radar. Colangelo took more than approximately $600,000 of that money for his own personal benefit. In furtherance of his scheme to defraud, Colangelo regularly communicated with the investors in

15

the Business Ventures and others by means of interstate electronic mail messages.

In total, according to the Government, the instant offense involved 11 victims, and one of the victims was a vulnerable victim because she suffered from memory loss. Colangelo caused the victims to suffer losses totaling at least $2.5 but less than $7 million. The names of the victims, their addresses, and their respective loss amounts is to be provided by the Government.

During the presentence interview, Colangelo told probation officers that he raised approximately $4,000,00 from investors; however, he lost $900,000 in trading and misappropriated the rest of the funds with the exception of $1 million, which was spent on the office attorney, payroll, accounting, lending money, and "foolish" spending over a four-year period. Colangelo admitted that he spent "lavishly" on housing, restaurants, travel, and birthday parties. Additionally, he reportedly gambled away approximately $500,000, and lent between approximately $60,000 and $75,000 which was never returned.

16

The Defendant has a relatively limited criminal history, including disorderly conduct in 1998, failure to appear in 2003, larceny and burglary in 2007, and driving while impaired in 2011 on two separate occasions.


The Relevant Statutory Provisions

For Counts One and Three, the maximum term of imprisonment is 20 years on each count, pursuant to 15 U.S.C. § 78j(b) and 78ff. For Counts Two and Four, the maximum term of imprisonment is 20 years on each count, pursuant to 18 U.S.C. § 1343.   If a term of imprisonment is imposed, for Counts One through Four, the Court may impose a term of supervised release of not more than three years, on each count, pursuant to 18 U.S.C. § 3583(b)(2).   The defendant is eligible for not less than one nor more than five years' probation by statute, on each count, pursuant to 18 U.S.C. § 3561(c)(1).

Four Counts One and Three, the maximum fine is $5 million per count, pursuant to 15 U.S.C. § 78j(b) and 78ff.   For Counts Two and Four, the maximum fine is $250,000 per count, pursuant to 18 U.S.C. § 3571.

17

A special assessment of $400 ($100 per count) is mandatory, pursuant to 18 U.S.C. § 3013.

As a result of committing the offenses alleged in Counts One through Four of this Indictment, Colagenlo shall forfeit to the U.S., pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of his offenses.

**The Guidelines**

The November 1, 2012 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes pursuant to § 1B1.11(a). The Court finds the following with respect to the Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Based on a total offense level of 28 and a Criminal History Category of I, the applicable guideline range of imprisonment is 78 to 97 months. The guideline range for a term

of supervised release is at least one year but not more than three years, on each count, pursuant to §5D1.2(a)(2). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to §5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to §5D1.1(a). Because the applicable guideline range is in Zone D of the Sentencing Table, the defendant is not eligible for probation, pursuant to §5B1.1.

The fine range for the instant offense is from $12,500 to $10,500,000 pursuant to §5E1.2(c)(3)(A) and (c)(4). Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,412.33 to be used for imprisonment, a monthly cost of $278.95 for supervision, and a monthly cost of $2,244.17 for community confinement. Pursuant to §5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

Under 18 U.S.C. § 3553(a)(1), the Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant."  Pursuant to 18 U.S.C. § 3553(2)(A), the Court weighs the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Given the severity of Defendant's offenses, as well as the significant losses by the victims in the instant offense, the sentence imposed, which is within the guidelines, is appropriate.

**The Sentence**

For the instant offense, Corbett will be sentenced to 78 months' imprisonment followed by three years supervised release.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1)     The defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol.  The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer.  The defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

(2)     The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may

include testing via breathalyzer at the direction and discretion
of the probation officer.

(3)    The defendant shall provide the probation
officer with access to any requested financial information.

(4)    The defendant shall not incur new credit charges
or open additional lines of credit without the approval of the
probation officer unless the defendant is in compliance with the
installment payment schedule.

A special assessment of $400, payable to the United
States, is mandatory and shall be due immediately.

It is further ordered that the defendant shall pay
restitution, payable to the Clerk, U.S. District Court, to be
forwarded to investors.  The victims' contact information and
the loss amounts owed to them are to be provided by the
Government.  Pursuant to 18 USSC 3664, the Government has 90
days following the date of sentence to provide the Court with
full information concerning the victims and amount of
restitution owed to each victim by the defendant.  The
restitution shall be paid in monthly installments of 15 percent

of gross monthly income over a period of supervision to commence
30 days after the date of the judgment or the release from
custody if imprisonment is imposed.  The defendant shall notify
the United States Attorney for this district within 30 days of
any change of mailing or residence address that occurs while any
portion of the restitution remains unpaid.

The terms of this sentence are subject to modification
at the sentencing hearing to be held on April 3, 2014.

It is so ordered.

New York, NY
March 28, 2014

ROBERT W. SWEET
U.S.D.J.

23